Byron Wayne MADDOX, Appellant,

v.

The STATE of Texas, Appellee.

No. 56695.

Court of Criminal Appeals of Texas, Panel No. 1.

Sept. 24, 1980.

On Rehearing Feb. 4, 1981.

On Rehearing April 4, 1981.

W. John Allison, Jr., Dallas, on appeal only, for appellant.

Henry Wade, Dist. Atty. and Stephen J. Wilensky, J. Russell Ormesher and Stephen P. Tokoly, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Before ONION, P. J., and ROBERTS and W. C. DAVIS, JJ.

## OPINION

ROBERTS, Judge.

### I.

The appellant was found guilty of murdering Kenneth Coppinger in the Dallas County jail. A jury assessed his punishment at confinement for life.

In a written statement made shortly after the murder, the appellant said that he was in the dayroom watching television while the murder took place in a cell, and that he knew nothing about the murder. In conferences with his appointed counsel during the months before trial, the appellant "never specifically wavered" from his alibi, and "in the end he would also specifically say that, 'Well, I guess I will just stand by the statement.'" The appellant was "evasive" with his counsel in discussing the nature of his defense; he would not indicate definitely whether he would testify. This uncertainty continued into the trial. During the presentation of the State's case, the appellant whispered to his counsel a number of things that were inconsistent with his alibi. Counsel testified:

"There were statements that he made ... that, 'It couldn't have happened', or that the way a particular witness was describing the way one of the other defendants, and, more specifically, ... there was one time specifically that it was David Villalon's actions were coming out during the trial. He had already been tried [for the murder] previous to Mr. Maddox'[s] trial. And the witness was stating how Mr. Villalon was holding Mr. Coppinger and what exactly he was doing, and Mr. Maddox was upset that he thought the witness was lying because he said, 'That wasn't the way Villalon had him, because I was doing this and Villalon was doing that.' * * * And there were numerous statements that he made ... or innuendos that it couldn't have happened a certain way, the way it was being described, or a certain person wouldn't have heard that because of something else, and the only way he would have known the because [sic] would be if he were present or took part in it."

These statements caused counsel to fear that the appellant might be intending to testify falsely.

At noon on the third day of the trial, the State rested. During the noon recess, counsel pressed the appellant for a decision on whether he would testify. The appellant said that he would testify, and apparently indicated that he would testify in accordance with his written statement of alibi. At lunch, counsel discussed with his partner (who was helping him try the case) the ethical problem that they would face if their client intended to give perjured testimony. They decided to consult a judge, who advised them to tell the trial judge that they needed to have a private conversation with the appellant. This they did, also telling the trial judge that there could be some perjured testimony if the appellant took the stand. The trial judge let the

attorneys use his library for a conference with the appellant. The appellant admitted that he had participated in the attack on Coppinger, but he asserted that he had the right to take the stand and lie because the State's witnesses had lied. The appellant refused to discuss the details of his planned testimony. The attorneys advised the appellant not to take the stand and give perjured testimony. At some point, the appellant refused to discuss the matter any more. The noon recess, which was to have been an hour and a half long, lasted about three hours.

The trial resumed in a normal fashion. The defense called five witnesses, four of whom already had testified for the State. The other, new witness presented evidence of alibi. He testified that he and the appellant had been watching television in the dayroom and were unaware of the murder until Coppinger's body was discovered in the corridor, after which they beat on the walls and yelled for about 15 minutes until a jailer came. (The appellant's later testimony comported with this account.) The appellant's attorneys conducted the examination of these witnesses in the usual manner.

After a recess, the following took place out of the presence of the jury:

"THE COURT: Both sides ready to proceed at this time?

"MR. LATMAN: Ready, Your Honor.

"THE COURT: All right.

"MR. LATMAN: We have a statement and motion to make. Your Honor, Mr. Smith and myself, as court appointed attorneys for Mr. Maddox, have tried to represent Mr. Maddox to the best of our ability in this case, giving him advice and counselling commensurate with our experience and knowledge and our best opinions. We have advised Mr. Maddox it would be against his interests to take the stand. We have also advised him he has a constitutional right not to take the stand and the Jury may not imply anything from that fact. We have explained to Mr. Maddox the areas which the State may go into if he takes the Stand, and we

have told him, in our best judgment, it is not in his best interests.

Also, certain other facts have come to our knowledge that we will not go into at this time, but Mr. Maddox has informed us that he wishes to take the stand. We feel that it is contrary to our duties as attorneys under the canons of ethics and the bar rules to comply in his doing this, although we realize he has a constitutional right, as does every citizen, to take the stand in his defense.

Therefore, at this time, and in view of those facts and other facts which we have made known to the Court in chambers, we humbly ask the Court to remove us as attorneys of record and absolve us of any further responsibility in this case.

"THE COURT: All right. Your request to be removed as counsel is denied, and the Court would instruct you to continue in the case to the best of your ability and within the ethics that govern the legal profession.

"MR. LATMAN: At this time, Your Honor, on behalf of the defendant, Maddox, he will take upon representing himself in taking the stand, and we ask that he be allowed, under the recent cases, to defend himself while he is on the stand and ask himself the questions.

"THE COURT: Mr. Maddox, do you wish to testify in the case?

"MR. MADDOX: Yes, sir, I do.

"THE COURT: And do you wish to undertake to assume the responsibilities of being your own attorney for the limited purpose of testifying and representing your testimony to the Jury?

"MR. MADDOX: Yes, sir, for that purpose only.

"THE COURT: The Court will allow you to assume your own representation in this respect."

After the trial court explained to the jury that the appellant had "elected ... to represent himself in the presentation of his testimony to the jury," the appellant testified in a narrative fashion, without the participation of counsel. On cross-examination, objections were made in a variety of

ways. The first interruption was made by the court's calling counsel to the bench, after which the State abandoned a line of objectionable questions. Next, the appellant's counsel requested a bench conference, which resulted in another line of objectionable questions being dropped. Thereafter, the appellant's counsel made several objections. The appellant's only effort to make a *pro se* objection was ignored.[1] After the appellant's testimony, the trial was recessed for the night.

The next morning (the fourth day of the trial), the appellant was presented with the court's proposed charge, to which he had no objection. He did have a motion to dismiss his counsel, because they had "hurt [his] testimony a lot" by refusing to examine him and by trying to persuade him to rest without presenting a case. The following took place after the appellant made his motion:

"THE COURT: All right. The Court will note that as your allegations and your contention. Do you wish to continue as your own attorney? Is that what you wish to do?

"MR. MADDOX: Yes, sir. I would ask that you appoint some counsel to advise me, and give me a little time to confer with them and get ready. And I would also ask that you would instruct these attorneys to give me a copy of all the notes they have taken through the State's case.

"THE COURT: Do you have any objection to him reviewing your notes?

"MR. LATMAN: Your Honor, he's more than welcome to our notes. I would say, since we are still his counsel, I don't think it would be proper for us to make any comment on his charges one way or the other, but we would say that we feel that our client does not know the consequences of the acts that he is asking to do. Although he has the right, I assume, to take over completely his defense with

another attorney advising him, we personally don't think it's in his best interests to do so.

"THE COURT: All right. The Court observes that the defendant has just been brought into the courtroom and has not had any opportunity to confer with counsel this morning. I will grant you a 5 or 10 minute recess to confer or advise with him concerning his motion and give him a chance to talk to you about it, and then I will proceed.

"MR. LATMAN: Thank you, Your Honor.

"MR. SMITH: Thank you, Your Honor.

(Whereupon, a recess was taken, after which the following proceedings were held.)

"THE COURT: All right. The Court has considered the defendant's motion made herein and the Court denies your motion to discharge your attorneys of record. This ruling is without prejudice to the defendant undertaking or continuing to undertake his own representation in the case in any or all of the remaining phases of the case. It is the opinion of the Court that the defendant's attorneys have conducted themselves honorably and to the defendant's best interests throughout the case, and it's the Court's opinion that the attorneys will continue to do so.

The attorneys will remain as counsel and will advise the defendant throughout the remaining phases of the case and will participate in any of the remaining portions of the case that the defendant allows you to participate in. In other words, the Court granted to the defendant the option to have his attorneys participate in any of the remaining phases of the case or to conduct his own defense in these remaining phases with the understanding that they are available and present to advise with him throughout.

"THE COURT: Just answer the question and no comments."

---

1. "Q: * * * You said that you were bitter at the Bible?

"A: That's correct. You asked me that now about 5 times. I believe the jury has heard it enough.

The Court feels that to rule otherwise at this stage of the proceedings would be a disruption of the judicial process and would subvert the interests of justice in this case. Now—

"MR. MADDOX: Note my exception.

"THE COURT: All right. Do you understand the ground rules?

"MR. MADDOX: Yes, sir.

"THE COURT: That you may call witnesses, you may make your argument to the Jury in any of the remaining phases of the case, you may conduct yourself without advice of counsel or you may conduct yourself with the understanding that you can talk to counsel and seek their advice, or you can have them conduct any particular phase for you.

"MR. MADDOX: Yes, sir.

"THE COURT: Now. Do you have another witness to call at this time?

"MR. MADDOX: Yes, I would like to call Sergeant Billy Ingram.

"THE COURT: Do you wish to present his testimony, or do you wish to have your lawyers question him?

"MR. MADDOX: Yes, I will question the rest of the witnesses and have my lawyers present my final argument."

After conducting the examination of two witnesses, the appellant rested. Despite the appellant's indication to the court, the attorneys did not make any final argument; the appellant did that himself.[2] The attorneys did give the appellant advice when he requested it.

After the jury's verdict of guilty, the attorneys resumed representation of the appellant, and the punishment phase of the trial was unremarkable.

## II.

Only one ground of error is set forth: that the appellant was denied effective assistance of counsel. Ultimately we must sustain that claim, albeit for different reasons than those that the appellant gives. The appellant argues that his attorneys were too quick to cry perjury; the State replies that they had no alternative. Both parties are wrong.

The parties are also wrong in asserting that this case presents a unique problem.[3] In fact the problem of the perjurious defendant is one that has attracted the attention of a small army of courts and commentators.[4]

---

**2.** According to the appellant, he asked his attorneys to divide the argument so that he could argue his own testimony and his attorneys could argue the rest of the evidence. He says the attorneys refused the request. The appointed attorney denied refusing the request; he testified that the appellant chose to make the entire argument.

**3.** To its credit, the State cited one relevant case; save for that case, said the State, "This case presents a question which . . . is unique in the panoply of criminal jurisprudence." The appellant has cited no relevant authorities.

**4.** Dozens of authorities are collected in Wolfram, "Client Perjury," 50 So.Cal.L.Rev. 809 (1977). For the sake of brevity, we shall cite here only the secondary authorities that are *not* cited in *Wolfram, supra,* or elsewhere in this opinion.

*See, e. g.,* Annotation, 64 A.L.R.3d 385 (1975); Brosnahan & Brosnahan, "The Attorney's Ethical Conduct During Adversary Proceedings," *Professional Responsibility* 143, 167-168 (A.B.A.1978); Braun, "Ethics in Criminal Cases," 55 Geo.L.J. 1048 (1967); Brazil, "Unanticipated Client Perjury and the Collision

of Rules of Ethics, Evidence, and Constitutional Law," 44 Mo.L.Rev. 601 (1979); Callan & David, "Professional Responsibility and the Duty of Confidentiality," 29 Rutgers L.Rev. 332 (1976); Dash, "The Emerging Role and Function of the Criminal Defense Lawyer," 47 N.C. L.Rev. 598, 630–632 (1969); Freedman, "The Professional Responsibility of the Prosecuting Attorney," 55 Geo.L.J. 1030 (1967) (postscript); Holzoff, "Ethics of Advocacy," 16 Buffalo L.Rev. 583 (1967); Lawry, "Lying, Confidentiality, and the Adversary System of Justice," 1977 Utah L.Rev. 653 (1977); Lefstein, "The Criminal Defendant Who Proposes Perjury," 6 Hofstra L.Rev. 665 (1978); Polster, "The Dilemma of the Perjurious Defendant," 28 Case W.Res.L.Rev. 3 (1977); Sevilla, "Between Scylla & Charybdis," 2 Nat'l J.Crim.Def. 237, 257–263 (1976); Starrs, "Professional Responsibility: Three Basic Propositions," 5 Am.Crim.L.Q. 17 (1966); 82 Dick.L.Rev. 545 (1978); 1979 Duke L.J. 1229 (1979); 3 J. Legal Profession 161 (1978); 126 U.Pa.L.Rev. 452, 458–465 (1977). *See generally* Abramson, "Attorneys, Clients, 'Ethics'," 52 Notre Dame Law. 797 (1977); Freedman, "Personal Responsibility in a Professional System," 27 Cath.U.L.Rev. 191

The problem of representing a defendant who insists on testifying falsely has been called, correctly, one of the hardest questions a criminal defense lawyer faces.[5] The attorney is faced simultaneously with a duty to represent his client effectively,[6] a duty to protect his client's right to testify,[7] a duty not to disclose the confidential communications of his client,[8] a duty to reveal fraud on the court,[9] and a duty not to knowingly use perjured testimony[10] (as well as the possibility of criminal liability for perjury).[11] The difficulty is increased by the defendant's right to put the prosecution to its burden of overcoming the presumption of innocence by proof beyond a reasonable doubt.[12] "In practice, ... the duties have come to be in perhaps uncontrollable conflict." G. Hazard, *Ethics in the Practice of Law* 129 (1978). Experienced and conscientious people can come to different conclusions about the best way to deal with the conflict.[13]

An illustration of the divergence of views is provided by the American Bar Association Standards Relating to the Defense Function (Approved Draft 1971). The introduction says:

"It has even been suggested, but *universally* rejected by the legal profession, that a lawyer may be excused for ac-

quiescing in the use of known perjured testimony on the transparently spurious thesis that the principle of confidentiality requires this. While *no* honorable lawyer would accept this notion ..., the mere advocacy of such fraud demeans the profession and tends to drag it to the level of gangsters and their 'mouthpiece' lawyers in the public eye. That this concept is universally repudiated by ethical lawyers does not fully repair the gross disservice done by the *few* unscrupulous enough to practice it." Id. at 142 (emphasis supplied).

But the commentary to Section 7.7 says, without pejoratives:

"On the other hand, there are lawyers who take the view that the lawyer's obligation of confidentiality does not permit him to disclose the facts he has learned from his client which form the basis for his conclusion that the client intends to perjure himself and that a warning to the client would be inconsistent with the assurances of confidentiality which counsel gave at the outset of the lawyer-client relationship." Id. at 276.

(Two empirical studies suggest that more than a few experienced attorneys do allow

---

(1978). *See also* D. Mellinkoff, *The Conscience of a Lawyer* (1973); Selinger, "Criminal Lawyers' Truth," 3 J. Legal Profession 57 (1978); 47 Cin.L.Rev. 431 (1978).

5.  Freedman, "Professional Responsibility of the Criminal Defense Lawyer: The Three Hardest Questions," 64 Mich.L.Rev. 1469 (1966).

6.  This includes a duty to determine all relevant facts known to the accused. ABA, Standards Relating to the Defense Function, Sec. 3.2(a) (Approved Draft 1971).

7.  See Tex.Const., Art. 1, Sec. 10; Art. 1.05, V.A.C.C.P.

8.  V.A.C.C.P., Art. 38.10; Rules Governing the State Bar of Texas, Art. 12, Sec. 8, [hereinafter cited as Texas Code of Professional Responsibility], DR 4–101.

9.  Texas Code of Professional Responsibility, DR 7–102(B)(1). The ABA has amended its Code by adding the phrase, "except when the information is protected as a privileged communication." ABA, Code of Professional Re-

sponsibility, DR 7–102(B)(1) (1978). This exception has not been adopted in Texas. It has been stated that DR 7–102(B) does not apply to the giving of false testimony in a criminal case. ABA, Standards Relating to the Defense Function—Supplement 18 (Approved Draft 1971).

10.  Texas Code of Professional Responsibility, DR 7–102(A)(4).

11.  See Sections 37.03 and 7.02(a)(2) and (3), V.T.P.C.

12.  M. Freedman, *Lawyers' Ethics in an Adversary System* 28 (1975).

13.  Freedman, "Professional Responsibility in the Practice of Criminal Law: The Murky Divide Between Right and Wrong," in *Professional Responsibility of the Lawyer* 49, 55 (1976); Kramer, "Clients' Frauds and Their Lawyers' Obligations," 67 Geo.L.J. 991 (1979); Levine, "Struggling with Ethical Standards in Massachusetts," 3 Litigation, No. 1, at 43 (Fall 1976).

the defendant to testify falsely.) [14] Section 7.7 itself is less than settled. In the draft approved in 1971, the underlined words replaced the bracketed words of the proposed draft.

"7.7 Testimony by the defendant.

(a) If the defendant has admitted to his lawyer facts which establish guilt and the lawyer's independent investigation establishes that the admissions are true but the defendant insists on his right to trial, the lawyer must advise his client against taking the witness stand to testify falsely.

(b) If, before trial, the defendant insists that he will take the stand to testify falsely, the lawyer must withdraw from the case, if that is feasible, seeking leave of the court if necessary.

(c) If withdrawal from the case is not feasible or is not permitted by the court, or if the situation arises during the trial and the defendant insists upon testifying falsely in his own behalf, it is unprofessional conduct for the lawyer [may not] to lend his aid to the perjury or use the perjured testimony. Before the defendant takes the stand in these circumstances, the lawyer should make a record of the fact that the defendant is taking the stand against the advice of counsel in some appropriate manner without revealing the fact to the court. The lawyer must confine his examination to identifying the witness as the defendant and permitting him to make his statement to the trier or the triers of the facts; the lawyer may not engage in direct examination of the defendant as a witness in the conventional manner and may not later argue the defendant's known false version of facts to the jury as worthy of belief and he may not recite or rely upon the false testimony in his closing argument."

In 1979, the Standing Committee on Association Standards for Criminal Justice proposed a further revision to Section 7.7:

"(a) If the defendant has admitted to his lawyer facts which establish guilt and the lawyer's independent investigation establishe[s]d that the admissions are true but the defendant insists on his right to trial, the lawyer must [advise] strongly discourage his client against taking the witness stand to testify [falsely] perjuriously.

"(b) If, [before] in advance of trial, the defendant insists that he will take the stand to testify [falsely] perjuriously, the lawyer [must] may withdraw from the case, if that is feasible, seeking leave of the court if necessary, but the court should not be advised of the lawyer's reason for seeking to do so.

"(c) If withdrawal from the case is not feasible or is not permitted by the court, or if the situation arises immediately preceding trial or during the trial and the defendant insists upon testifying [falsely] perjuriously in his own behalf, it is unprofessional conduct for the lawyer to lend his aid to the perjury or use the perjured testimony. Before the defendant takes the stand in these circumstances, the lawyer should make a record of the fact that the defendant is taking the stand against the advice of counsel in some appropriate manner without revealing the fact to the court. The lawyer [must confine his examination to] may identify[ing] the witness as the defendant and [permitting him to make his statement to the trier or the triers of the facts;] may ask appropriate questions of the defendant when it is believed that his answers will not be perjurious. As to matters for which it is believed the defendant will offer perjurious testimony, the lawyer [may not engage in] should seek to avoid direct examination of the defendant [as a witness] in the conventional manner; instead, the lawyer should ask the defendant if he wishes to make any additional statement concerning the case to the trier or triers

14. Friedman, "Professional Responsibility in D.C.: A Survey," 25 Res Ipsa Loquitur 60 (1972) (95%); Reichstein, "The Criminal Law Practitioner's Dilemma," 61 J.Crim.L.C. & P.S.

1 (1970) (majority of Chicago Bar Ass'n Committee of Professional Ethics). *See also* 50 Texas L.Rev. 60, 105–107 (1971).

of the facts. A lawyer [and] may not later argue the defendant's known false version of the facts to the jury as worthy of belief, and he may not recite or rely upon the false testimony in his closing argument."

A counter-proposal was made by the ABA's Section of Criminal Justice, which would have had Section 7.7 read:

"(a) If the defendant has admitted to his lawyer facts which establish guilt and the lawyer's independent investigation establishes that the admissions are true but the defendant insists on his right to trial, the lawyer must advise his client against taking the witness stand to testify falsely.

"(b) If, before trial, the defendant insists that he will take the stand to testify falsely and his right to testify in his own behalf is guaranteed by Constitution or statute, the lawyer must continue to advise the defendant against taking the witness stand to testify falsely.

"(c) During trial if the defendant insists that he will take the stand to testify falsely against the advice of counsel and his right to testify in his own behalf is guaranteed by Constitution or statute, the lawyer shall treat his client's testimony as any other evidence."

These proposed revisions were withdrawn because of controversy and lack of a consensus. "Report on the ABA Mid-Year 1979 Meeting," 27 Louisiana Bar Journal 35 (1979). It was hoped that the problem would be dealt with in a general revision of the Code of Professional Responsibility. "New Criminal Standards Drop Update on Perjury," 65 American Bar Association Journal 336 (1979). These hopes were not fulfilled. The proposed ABA Model Rule of Professional Conduct 3.1 (Discussion Draft 1980) reflects a recognition that the law is unsettled, and it does not provide a clear rule:

"A lawyer shall be candid toward a tribunal.

"(a) A lawyer shall not:

* * * * * *

"(3) except as provided in paragraph (f), offer evidence that the lawyer is convinced beyond a reasonable doubt is false, or offer without suitable explanation evidence that the lawyer knows is substantially misleading; * * *

"(b) except as provided in paragraph (f), if a lawyer discovers that evidence or testimony presented by the lawyer is false, the lawyer shall disclose that fact and take suitable measures to rectify the consequences, even if doing so requires disclosure of a confidence of the client or disclosure that the client is implicated in the falsification.

* * * * * *

"(d) except as provided in paragraph (f), a lawyer shall disclose a fact known to the lawyer, even if the fact is adverse, when disclosure:

"(1) is required by law or the rules of professional conduct; or

"(2) is necessary to correct a manifest misapprehension resulting from a previous representation the lawyer has made to the tribunal.

"(e) except as provided in paragraph (f), a lawyer may apprise another party of evidence favorable to that party and may refuse to offer evidence that the lawyer believes with substantial reason to be false.

"(f) A lawyer for a defendant in a criminal case:

"(1) is not required to apprise the prosecutor or the tribunal of evidence adverse to the accused, except as law may otherwise provide;

"(2) may not disclose facts as required by paragraph (d) if doing so is prohibited by applicable law;

"(3) shall offer evidence regardless of belief as to whether it is false if the client so demands and applicable law requires that the lawyer comply with such a demand.

* * *"

The Comment to the Rule noted:

" * * * The general rule—that an advocate must disclose perjury, even that of

a client—applies to defense counsel in criminal cases, as well as in other instances. However, the definition of the lawyer's ethical duty in such a situation is qualified by the requirements of due process and the right to counsel in criminal cases. Due process and the right to counsel in criminal cases have been construed in some jurisdictions to require that counsel present an accused as a witness if the accused wishes to testify, even if counsel knows the testimony will be false. The obligation of the advocate under these Rules is subordinate to such a requirement. See paragraph (f)(3)."

Another recent attempt to codify ethical rules prescribes a completely different duty. See The Roscoe Pound—American Trial Lawyers Foundation, The American Lawyer's Code of Conduct, rules 1.2, 3.7, & 6.6 (public discussion draft 1980) (published in 16 Trial, No. 8, August, 1980, at 44). Emphasizing the requirement of confidentiality, the drafters of this Code provided Illustrative Case 6(a):

"A lawyer representing the accused in a criminal case learns from the client that he intends to present a false alibi. The lawyer knows that he will be required to give an explanation to the judge if he makes motion for leave to withdraw as counsel; he also knows that the judge will take an equivocal explanation as an indication that the client intends to commit perjury. The lawyer nevertheless asks leave to withdraw, telling the judge only, 'I have an ethical problem,' or, 'My client and I do not see eye to eye.' The lawyer has committed a disciplinary violation."

It may be seen that there is no accepted solution to the problem of the perjurious client. The question is not whether the appellant's attorneys followed the only acceptable course, for no such course is established. The question is not even whether they followed the best course. The question is whether they fell below the constitutionally mandated standard of reasonably effective assistance of counsel. See Carter v. Bordenkircher, W.Va., 226 S.E.2d 711, 714 (1976).

It first must be stressed that the attorneys were told positively by the appellant that he intended to testify falsely. They had not merely surmised that the appellant's alibi was false; a motion to withdraw (or other abdication of duty) is not justified by mere conjecture. United States ex rel. Wilcox v. Johnson, 555 F.2d 115 (3rd Cir. 1977); Johns v. Smyth, 176 F.Supp. 949 (E.D.Va.1959). See American Bar Association, Standards Relating to the Defense Function 276 (Approved Draft 1971). The appellant's complaints on appeal are that his attorneys too quickly "judged their client guilty without sufficient proof to sustain their conclusion" and that they did not make "a good faith effort to dig out the facts." The record simply does not support either complaint. The appellant explicitly told his attorneys that his alibi was false and that he wanted to testify falsely. In the face of those statements the attorneys' actions were not based on any personal opinion of guilt. And, according to the testimony on the motion for new trial, the appellant himself blocked any attempt to "dig out" his story by being evasive before trial and by refusing to talk with his attorneys at the noon recess on the third day of trial. The appellant's argument has no merit.

It is true that the attorneys departed from American Bar Association, Standards Relating to the Defense Function, Section 7.7(c) (Approved Draft 1971) when they expressly revealed to the judge the appellant's stated intention to testify falsely.[15] But this is not necessarily error. See State v. Robinson, 290 N.C. 56, 224 S.E.2d 174 (1976); State v. Henderson, 205 Kan. 231,

15. Even a motion to withdraw for no stated reason may reveal to the court the attorney's belief that his client's testimony is false. Lowery v. Cardwell, 575 F.2d 727 (9th Cir. 1978). A motion to withdraw is not likely to be granted in mid-trial, anyway. The "record" spoken of in Section 7.7(c) is not the official record of the trial, but is a private notation, for example, signed by the client and witnessed by another attorney. ABA, Standards Relating to the Defense Function 277 (Approved Draft 1971).

468 P.2d 136 (1970); American Bar Association, Standards Relating to the Defense Function, Section 1.1(f) (Approved Draft 1971).[16] It is important that the judge was not the finder of fact in this case, for a revelation to the finder of fact that a defendant is testifying falsely can deny due process. *See Lowery v. Cardwell*, 575 F.2d 727 (9th Cir. 1978). It also is important that the appellant had elected to have the jury assess punishment. Much of the supposed harm in the making of a motion to withdraw because of a defendant's perjury is based on the assumption that the sentencing judge will be affected. *See* American Bar Association, Standards Relating to the Defense Function 277 (Approved Draft 1971); M. Freedman, *Lawyers' Ethics in an Adversary System* 34 (1975). Much of this potential for harm is removed if the jury assesses punishment. We hold that the appellant was not deprived of effective assistance of counsel by his attorneys' moving to withdraw.

We also hold that the appellant was not deprived of effective assistance of counsel when he was permitted to testify in narrative form rather than in answer to questions from his attorney. *Thornton v. United States*, 357 A.2d 429 (D.C.App.1976); *People v. Lowery*, 52 Ill.App.3d 44, 366 N.E.2d 155, 9 Ill.Dec. 41 (1977). *See* American Bar Association, Standards Relating to the Defense Function, Section 7.7(c) and commentary at 276 (Approved Draft 1971). Ethics do not require that a defendant "assume the responsibilities of being his own attorney" when he insists on giving perjured testimony, for the attorney may put his client on the stand and confine his examination to identifying the witness and

permitting him to make his statement. *Id.*[17] To say that the method used in this case may not have been the best is not to say that it deprived the appellant of effective assistance of counsel. The appellant was able to make his narrative statement, albeit without a question such as "Tell the jury what happened on the night in question." He also was protected from objectionable cross-examination. Had the appellant's adventure in self-representation ended when he left the stand at the close of the third day of trial, we would not say that reversible error had been committed. But a different problem was presented on the following morning.

### III.

The crisis of the preceding day had been precipitated by the attorneys' motion to withdraw. It was resolved by permitting the appellant to engage in a very limited form of self-representation[18] that in fact was restricted to his direct testimony. On the morning of the fourth day, it was not the attorneys who wanted to withdraw; it was the appellant who wanted to dismiss his attorneys because of disaffection with them. Unlike the perjury problem which we have discussed, the problem presented by the defendant who wants at the last minute to dismiss his appointed attorney is not new to this Court.

A defendant's attempt to represent himself in a criminal trial may involve problems of constitutional dimension which we will notice as unassigned error in the interest of justice. *Goodman v. State*, 591 S.W.2d 498 (Tex.Cr.App.1979). *See* V.A.C.C.P., Article 40.09, Sec. 13. We have done so in this

---

16. "(f) * * * These standards are not intended as criteria for the judicial evaluation of the effectiveness of counsel to determine the validity of a conviction; they may or may not be relevant in such judicial evaluation, depending upon all the circumstances."

Also, as we have noted, Section 7.7 is by no means universally accepted as the correct procedure. See, e. g., Polster, supra note 4; Wolfram, supra note 4.

17. For a successful example, see *Thornton v. United States*, 357 A.2d 429 (D.C.App.1976).

18. "THE COURT: And do you wish to undertake to assume the responsibilities of being your own attorney for the limited purpose of testifying and representing your testimony to the Jury?

"MR. MADDOX: Yes, sir, for that purpose only.

"THE COURT: The Court will allow you to assume your own representation in this respect."

case, for the record does not reflect that the appellant was made aware of the dangers of representing himself.

First we note that it was not error for the trial court to refuse the appellant's requests for the appointment of other counsel and for a delay. *Miller v. State*, 479 S.W.2d 670 (Tex.Cr.App.1972). The trial court was correct in trying to prevent the obstruction of orderly procedure.

Nor was it error for the court to consider the appellant's wish to represent himself. In *Jordan v. State*, 571 S.W.2d 883, 884 (Tex.Cr.App.1978), we summarized the law concerning waiver of counsel:

"[A]n accused may waive his right to counsel if such waiver is made voluntarily with knowledge of the consequences thereof. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Barbour v. State*, 551 S.W.2d 371 (Tex.Cr. App.1977); *Thomas v. State*, 550 S.W.2d 64 (Tex.Cr.App.1977). To assure protection of so fundamental a right, courts indulge every reasonable presumption against waiver of counsel. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Barbour v. State*, supra; *Thomas v. State*, supra. To this extent, this court has held that the record must clearly show that the accused voluntarily, knowingly and intelligently waives his right to counsel in order to assert his right to represent himself. *Thomas v. State*, supra; *Webb v. State*, 533 S.W.2d 780 (Tex.Cr.App.1976)."

In *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), the Court said that a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' *Adams v. United States ex rel. McCann*, 317 U.S. [269], at 279 [63 S.Ct. 236 at 241, 87 L.Ed. 268]." [19] *See Goodman v. State*, supra.

The record does not establish that the appellant was made so aware of the dangers and disadvantages of self-representation that he made a knowing and informed choice. In the face of an explicit statement by counsel that "our client does not know the consequences of the acts that he is asking to do," the trial court did nothing but to grant a short recess so that the appellant could confer with his attorneys. Of this conference (if it was held) nothing appears in the record, except one attorney's testimony that he never advised the appellant of the effect his actions might have on the jury. This, of course, was the principal danger and disadvantage of self-representation in this situation. When an attorney sits silently while his client examines a witness, this conveys to the jury that the attorneys are at odds with their client and that they attach little significance or credibility to the witnesses, which has the effect of denying a fair trial. *State v. Robinson*, 290 N.C. 56, 224 S.E.2d 174 (1976). Although the appellant announced to the court that his attorneys would argue the case to the jury, he evidently waived this aspect of representation as well.[20] The failure of the attorneys to argue to the jury was "as though the attorney had told the jury that his client had uttered a falsehood in making the statement [on the stand]." *Johns v. Smyth*, 176 F.Supp. 949, 953 (E.D.Va.1959). There is nothing in the record to show that

---

**19.** We have said, "The trial court should therefore admonish an accused who desires to represent himself regarding the wisdom and practical consequences of that choice." *Webb v. State*, 533 S.W.2d 780, 785 (Tex.Cr.App.1976). This advice is tempered by the admonition that, "The task of judging the competence of a particular accused [to waive trial rights] cannot be escaped by announcing delusively simple rules of trial procedure which judges must mechanically follow. The question in each case is whether the accused was competent to exercise an intelligent, informed judgment...." *Ad-*

*ams v. United States ex rel. McCann*, supra, at 277, 63 S.Ct. at 241. But "[i]n any event, the record must clearly show that the accused voluntarily, knowingly, and intelligently waived his right to counsel in order to represent himself. It must be kept in mind that the need for clarity in the record is directly related to the fact that courts will indulge every reasonable presumption against the waiver of a constitutional right." *Webb v. State*, supra.

**20.** See note 2, supra.

the appellant was made aware of these or any other disadvantages of self-representation. The record does not support the conclusion that the appellant's waiver was knowing and intelligent. *See Barbour v. State*, 551 S.W.2d 371 (Tex.Cr.App.1977). As a result, we must sustain the appellant's contention that he was denied the effective assistance of counsel.

The judgment must be reversed and the cause remanded.

ONION, P. J., and W. C. DAVIS, J., concur in the results.

## OPINION ON STATE'S MOTION FOR REHEARING

ODOM, Judge.

On original submission we determined that the record in this cause did not reflect that appellant was made aware of the dangers of representing himself. We accordingly reversed and remanded for this failure to admonish appellant. We are now satisfied that this conclusion was erroneous.

The facts are well developed in our original opinion. In denying appellant's motion to discharge his attorneys, the trial court stated:

"The court has considered the defendant's motion made herein and the Court denies your motion to discharge your attorneys of record. * * * It is the opinion of the court that the defendant's attorneys have conducted themselves honorably *and to the defendant's best interests* throughout the case, and it's the court's opinion *that the attorneys will continue to do so.*

*"The attorneys will remain as counsel and will advise the defendant throughout the remaining phases of the case and will participate in any of the remaining portions of the case that the defendant allows you to participate in.* In other words, the court granted to the defendant the option to have his attorneys participate in any of the remaining phases of the case or to conduct his own defense in these remaining phases with the under-

standing that they are available and present to advise with him throughout. . . ." (Emphasis added.)

The record reflects that the attorneys did give appellant advice when he requested it. Further, the record reflects that appellant's attorneys responded to objections made by the State during appellant's direct examination of defense witnesses. Appellant's attorneys also interposed an objection to the court's charge, and also made several objections during the State's closing arguments.

Hence we are not presented with situations like those in *Geeslin v. State*, 600 S.W.2d 309 (Tex.Cr.App.); *Jordan v. State*, 571 S.W.2d 883 (Tex.Cr.App.); or *Webb v. State*, 533 S.W.2d 780 (Tex.Cr.App.) in which defendants acted *alone* in their self-representation. Rather, we are presented with facts more akin to those in *Phillips v. State*, 604 S.W.2d 904 (Tex.Cr.App.) In *Phillips*, as in the case at bar, the defendant was allowed to engage in a form of hybrid representation; that is, partially pro se and partially by counsel. Further, in *Phillips* and the instant case, defense counsel continued to actively participate in the trial of the cause. In rejecting Phillips' claim that he was entitled to admonishments concerning the dangers of self-representation, we stated:

"These admonishments are to be given a pro se defendant to insure that he is informed of the dangers involved when he waives counsel. Although appellant partially represented himself in this case, he was also fully represented by counsel. Thus no question of waiver of counsel is involved. Absent such an issue arising, we cannot conclude that the trial court [erred] in failing to admonish appellant as to the dangers, if any, of this form of hybrid representation."

We find the same principle applicable in the case at bar.

This was the sole ground of error raised in this appeal; however, the record has been reviewed to see if other grounds should be considered as unassigned error in the interest of justice pursuant to Art. 40.-09, Sec. 13, V.A.C.C.P. None have been found.

The State's motion for rehearing is granted and the judgment is affirmed.

ONION, P. J., and ROBERTS, DALLY and CLINTON, JJ., dissent.

## ON OVERRULING OF APPELLANT'S MOTION FOR REHEARING WITHOUT WRITTEN OPINION

TEAGUE, Judge, concurring.

Although I concur in the conclusion reached in the Court's opinion on the State's motion for rehearing by Judge Odom that appellant never "triggered" the self-representation scheme of *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), I write to make it clear that no panacea for the difficult problem of the perjurious client has been presented here. Trial courts should not assume that the only solution, or even a proper one, is to require an attorney, who may have lost the confidence of his accused client, to continue his representation of the accused unchanged or, in hybrid form as seen in the instant case, to require the accused to accept such continued representation. For, to do so, he may not successfully navigate the oftentimes precarious attorney-client relationship and may also find himself between the rock of Scylla and the whirlpool of Charybdis as well as upon the rocks of procedurally hazardous passageways involving competing interests. In short, there is not and cannot be an ironclad general rule laid down by this Court in this type case as the ultimate decision a trial court reaches under one set of facts will not necessarily carry over to another case albeit their similar characteristics. The thorny problems, real, hypothetical, and imagined, simply do not lend themselves to cookbook solutions, and I urge trial judges not to take the actions of the trial judge in this case as a recipe for meeting such problems in the future.

I urge, rather, that trial courts remain alert to the ramifications of the particular case they may be confronted with and to take such steps as may be appropriate in the particular circumstances to ensure that the accused in his particular cause, under facts as presented here, has the effective and adequate representation of counsel. See also *People v. Salquerro*, New York Supreme Court, 433 N.Y.S.2d 711 (1980), for a further discussion of the possible perjurious client.